**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                         )
INMODE LTD.,                             )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )          Civil Action
                                         )          No. 24-12955-PBS
BTL INDUSTRIES, INC.,                    )
                                         )
                    Defendant.           )
_____)
```

**MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION**


July 20, 2026

Saris, D.J.


**INTRODUCTION**

This patent dispute involves a method of using radiant energy to tighten loose vaginal tissue.  InMode Ltd. ("InMode") accuses BTL Industries, Inc. ("BTL") of infringing several claims in U.S. Patent No. 8,961,511 (the "'511 Patent"), including independent claims 1, 35, 43, and 51.  The parties dispute the meaning of three terms used within these claims: (1) "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock"; (2) "heating the target tissue"; and (3) "remodeling the therapeutic zone of

1

target tissue."[1]  The Court held a non-evidentiary Markman

hearing on April 21, 2026, and now adopts the following

constructions.

## BACKGROUND

During vaginal childbirth, tissue in the vagina is often

permanently stretched, a phenomenon that may lead to long term

medical consequences for women (for example, uterine prolapse,

stress urinary incontinence, and decreased sexual pleasure).

'511 Patent col. 1:62-2:4.  In the past, the effects of vaginal

stretching could only be treated with invasive surgical

procedures, many of which were unpopular because they "bring

with them a risk of scarring that is entirely counterproductive

with regard to the desired result."  Id. col. 2:11-12.  The '511

Patent, entitled "Vaginal Remodeling Device and Methods,"

addresses the problem by providing a non-invasive and non-

ablative method for "remodeling" (or "tightening") vaginal

tissue using radiant energy.  Id. Abstract; id. col. 1:13-15.

The claimed invention works in two steps.  First, heat is

applied to connective tissue in the vagina,[2] id. col. 4:14-16,

---

[1] Although the parties initially disputed the meaning of
a fourth term, "contact sites," see Dkt # 181 at 2, they
have since reached an agreement on its construction, see
Dkt # 188 at 3.

[2] The vagina is made up of three layers: (1) the
mucosal epithelium, a surface layer of epithelial cells
which protect the organ from the external environment; (2)

2

11:19-35, which naturally contains collagen molecules, id. col. 1:22-25, 3:44-46, 12:11-13.  (Because the surface layer of the vagina is more vulnerable to heat than connective tissue, the patent discloses simultaneously cooling the epithelium while heating the connective tissue.  Id. col. 4:7-13, 4:60-62, 11:5-9, 12:24-26.)  Second, through a process known as denaturation, the collagen molecules in the connective tissue contract, causing an immediate tightening effect on vaginal tissue.[3]  Id. col. 1:35-39, 4:58-60, 4:63-65, 5:2-4, 12:39-44.

Claim 35 is representative of the claimed technology:[4]

**35.** A method for remodeling a therapeutic zone within a target tissue, the target tissue comprising tissue underlying an epithelium of female genital tissue comprising at least one of vulva, introitus and vagina tissue, the method comprising:

heating the target tissue, and

remodeling the therapeutic zone of target tissue, wherein the heating includes heating a portion of the

---

the submucosa or lamina propria, which sits below the mucosal epithelium and contains connective tissue; and (3) the muscularis, the deepest layer, which contains smooth muscle.  Id. col. 1:19-22.

[3] "Remodeling may also occur substantially after the heating has occurred" through "biological healing responses to the stress of heating," which may include "the deposition of new collagen."  Id. col. 4:65-5:2; see also id. col 12:44-49.

[4] Claims 1, 43, and 51 merely change the area of treatment within the embedded wherein clause.  Because the parties do not dispute the proper construction of the areas referenced in these claims, the differences are immaterial for claim construction purposes.

vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is 12 o'clock.

Id. cl. 35.

## DISCUSSION

### I.    Legal Standard

Claim construction is a matter of law for a court to decide.  See Markman v. Westview Instruments, Inc., 517 U.S. 370, 372, 391 (1996).  It "requires a determination as to how a person of ordinary skill in the art would understand a claim term 'in the context of the entire patent, including the specification.'"  Trs. of Columbia Univ. v. Symantec Corp., 811 F.3d 1359, 1362 (Fed. Cir. 2016) (quoting Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)).  Courts begin the analysis by looking to "the language of the claims themselves."  Id.  In many instances, "the use of a term within the claim provides a firm basis for construing the term." Phillips, 415 F.3d at 1314.  Claim terms are generally given their "ordinary and customary meaning," or "the meaning that the term would have to a person of ordinary skill in the art" at the time of the invention.  Id. at 1312-1313.

"The claims, of course, do not stand alone."  Id. at 1315. "[T]hey are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims."  Id. (quoting Markman, 52 F.3d at 978).  "For that

4

reason, claims 'must be read in view of the specification, of which they are a part.'" Id. (quoting Markman, 52 F.3d at 979); see also Netword, LLC v. Centraal Corp., 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose."). The specification is "the single best guide to the meaning of a disputed term and is, thus, the primary basis for construing the claims." Symantec, 811 F.3d at 1362 (cleaned up).

"A court should also consider the patent's prosecution history." Id. at 1362-63. "The prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." Philips, 415 F.3d at 1317. It "inform[s] the meaning of the claim language by demonstrating how the inventor understood the invention." Id.

Finally, a court may consult extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Id. (quoting Markman, 52 F.3d at 980). Extrinsic evidence guides the analysis of how "a person of ordinary skill in the art would understand claim terms." Id. at 1319. Courts "view[] extrinsic evidence in general as less

reliable than the patent and its prosecution history in determining how to read claim terms."  Id. at 1318.

## II.  Disputed Terms[5]

**Heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock**

| InMode's Proposed Construction | BTL's Proposed Construction |
| --- | --- |
| Heating multiple, contiguous contact sites in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall. | Heating the tissue underlying more than one site on the epithelium in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall, wherein the aspect closest to the urethra is at 12 o'clock. |

InMode argues that "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock" means "heating multiple, contiguous contact sites in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall."  BTL proposes a different construction: "heating

---

[5] Although the parties rely heavily on the various interpretations of the disputed terms adopted by other courts in litigation involving the '511 Patent, only two of these decisions resulted in final constructions on the merits (the others were merely preliminary): Judge Gilstrap's opinion in in Viveve, Inc. v. Thermigen, LLC, No. 16-cv-1189 (E.D. Tex. Nov. 13, 2017), see Dkt # 187-20, and the PTAB's opinion in BTL Indus., Inc. v. InMode Ltd., No. IPR2024-00703 (P.T.A.B. Oct. 1, 2025), see Dkt # 152-1. While the Court may consider these decisions to the extent it finds the underlying reasoning persuasive, the Court retains an independent legal duty to interpret the disputed claim terms based on the claim language and specification.

the tissue underlying more than one site on the epithelium in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall, wherein the aspect closest to the urethra is at 12 o'clock."

The Court (like the PTAB in the BTL IPR, see Dkt # 152-1 at 13-16) finds InMode's proposed construction more consistent with the intrinsic record than BTL's.  The claim language speaks of heating a portion of the vagina "circumferentially around" its wall "from" 1 o'clock "to" 11 o'clock.  Because "from" and "to" are typically used to measure distance, their use here implies that heating begins at the 1 o'clock position and continues "around" the vaginal wall unabated until it reaches 11 o'clock. This interpretation aligns with the specification, which repeatedly references treating a "300 degree arc" of the vagina. See '511 Patent col. 11:56-58 ("[E]mbodiments of the invention comprise treating and remodeling the vagina over the 300 degree circumferential arc from about 1 o'clock to about 11 o'clock."); id. col. 14:38-40 ("Accordingly, with a treatment tip of about 1 cm in width, a series of about 10 contact sites allows completion of an 300 degree arc of the circumference, between the 1 o'clock and 11 o'clock positions.").

Although the court adopts InMode's construction, it nonetheless will replace the word "contiguous" with "adjacent" (a term to which BTL did not object during the Markman hearing,

see Tr. [Dkt # 214] at 38), in recognition of the fact that, best efforts aside, there may nonetheless be gaps between the contact sites consistent with Figures 9A and 9B. The court also will include "wherein the aspect closest to the urethra is at 12 o'clock," as InMode does not offer any persuasive reason to drop this phrase.

The Court accordingly construes the term "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock" to mean "heating multiple, adjacent contact sites in the 300 degree arc extending from 1 o'clock to 11 o'clock along the vaginal wall wherein the aspect closest to the urethra is at 12 o'clock."

**Heating the target tissue**

| InMode's Proposed Construction | BTL's Proposed Construction |
|---|---|
| Heating at least the tissue underlying the epithelium to a temperature of no more than about 80 degrees C. | Heating the tissue underlying the epithelium to a temperature that is higher than the temperature of the epithelium. |

The parties agree that "heating the target tissue" entails raising the temperature of the target tissue. Each party asserts, however, that the term goes beyond this plain and ordinary meaning and includes an additional temperature-based limitation. For InMode, that limitation is absolute: "heating at least the tissue underlying the epithelium to a temperature

8

of no more than about 80 degrees C." For BTL, that limitation is relative: "heating the tissue underlying the epithelium to a temperature that is higher than the temperature of the epithelium."

As the Court previewed during the Markman hearing, it is not convinced that either construction is supported by the intrinsic record. The claims do not, on their face, impose any maximum temperature for the recited heating, nor do they purport to compare the temperature of the target tissue to that of the epithelium. This absence is significant, as the same limitations are expressly recited in subsequent dependent claims. See, e.g., '511 Patent cl. 2 ("The method of claim 1, wherein heating the target tissue comprises heating it to a temperature between 45 degrees C. and 80 degrees C."); id. cl. 9 ("The method of claim 1, wherein the method further comprises cooling the epithelium."); id. cl. 15 ("The method of claim 9, wherein the combination of cooling the epithelium and heating the target tissue creates a reverse thermal gradient from the epithelium to the target tissue."). Neither party explains what value these dependent claims add if "heating the target tissue" means heating the target tissue "to a temperature of no more than about 80 degrees C" or heating the target tissue "to a temperature that is higher than the temperature of the epithelium." See AK Steel Corp. v. Sollac & Ugine, 344 F.3d

9

1234, 1242 (Fed. Cir. 2003) ("Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend."); Intamin Ltd. v. Magnetar Techs., Corp., 483 F.3d 1328, 1335 (Fed. Cir. 2007) ("An independent claim impliedly embraces more subject matter than its narrower dependent claim.").

Turning to the specification, the Court acknowledges that the patent does not disclose any embodiment of the claimed invention in which target tissue is heated to more than about 80 degrees C, see '511 Patent col. 4:23-40, 11:19-35, or in which target tissue is heated without the epithelium simultaneously being cooled, see id. col. 2:35-40, 4:3-13, 4:40-43, 4:60-62, 8:38-42, 11:5-9, 12:24-26.  But "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." Hill-Rom Servs., Inc. v. Stryker Corp., 755 F.3d 1367, 1372 (Fed. Cir. 2014) (alteration in original) (internal quotation marks and citations omitted).  Here, neither party has demonstrated a clear intent to limit "heating the target tissue" to something beyond its plain language.[6]

---

[6] The Court acknowledges that Judge Gilstrap reached a contrary conclusion in Viveve.  See Dkt # 187-20 at 10-14.

To the extent each party contends that "heating the target tissue" <u>must</u> include its proposed limitation because any other interpretation is inconsistent with the invention described in the specification (a critical component of which is its non-invasive/non-ablative nature), the Court is not convinced.  It may very well be the case that the target tissue will burn at a temperature higher than 80 degrees C or that the epithelium will burn if it is not actively cooled during the procedure.  Neither party, however, explains where <u>in the specification</u> the patentee manifests a clear intent to define the term "heating the target tissue" to inherently include either a maximum temperature or maintenance of the epithelium.

Because the court declines to import the limitations proposed by the parties into the claim term, it will adopt the plain and ordinary meaning of "heating the target tissue": "raising the temperature of the target tissue."

**Remodeling the therapeutic zone of target tissue**

| InMode's Proposed Construction | BTL's Proposed Construction |
|---|---|
| The result of raising the temperature of target tissue to no more than about 80 degrees C without substantially affecting the epithelium overlying the | Causing a zone of tissue within the target tissue to tighten or contract by heating the zone of tissue to a therapeutic temperature. |

---

The Court nonetheless remains convinced that the disclosures in the specification are insufficient to overcome the strong presumption against importing limitations into the claims.

| target tissue, where that result includes a tightening or contraction of the target tissue. | |

The parties agree that "remodeling" effectively means tightening or contracting the target tissue.  See Tr. at 20; see also '511 Patent col. 13:2-4 ("Remodeling of the genital tissue, as practiced by embodiments of this invention, may be understood variously as contracting or tightening of tissue. . . ."). InMode further asserts, however, that the term "remodeling the therapeutic zone of the target tissue" encompasses the limitation "without substantially affecting the epithelium overlying the target tissue."

InMode's proposed construction finds no support in the intrinsic record.  Nothing in the claim language addresses the impact of remodeling on the epithelium.  This stands in stark contrast to the language used in several dependent claims, where epithelium maintenance is explicitly recited as either an additional step in the claimed method, see, e.g., '511 Patent cl. 9 ("The method of claim 1, wherein the method further comprises cooling the epithelium."), or a further limitation on the "heating" step, see, e.g., id. cl. 24 ("The method of claim 1, wherein the heating does not modify a mucosal epithelium of the genital tissue.").

InMode asserts that the court should nonetheless import an

12

epithelium maintenance limitation from the specification.  It does not, however, identify any language in the specification limiting the term "remodeling the therapeutic zone of the target tissue" to "without substantially affecting the epithelium overlying the target tissue."  At best, InMode points to a single statement in the specification that "[t]he remodeling of the connective tissue underlying the mucosal epithelial surfaces does not substantially affect the epithelium itself."  Id. col. 12:17-19.  But this statement does not clearly manifest an intent to define or limit the term "remodeling the therapeutic zone of the target tissue" to include epithelium maintenance. The next sentence reads: "The method and apparatus, as provided by embodiments of the invention are non-invasive and substantially non ablative of genital issue."  Id. col. 12:19-21.  Because the patentee is describing the features of the claimed invention generally rather than the remodeling step specifically, the statement cited by InMode does not support imparting the requested limitation into the claim term.

To fill the gap, InMode highlights the purpose of the claimed invention, arguing that it cannot be achieved without epithelium maintenance.  But the fact that protecting the epithelium is critical to the claimed invention does not give the court a basis to import that limitation into any specific claim term – especially not where, as here, subsequent dependent

13

claims explicitly recite epithelium maintenance limitations (and place those limitations either within an entirely new "cooling" step of the claimed method or within the previously recited "heating" step).

The Court construes "remodeling the therapeutic zone of target tissue" to mean "causing a zone of tissue within the target tissue to tighten or contract by heating the zone of tissue to a therapeutic temperature."

## ORDER

For the reasons stated above, the Court construes the disputed terms as follows:

- "heating a portion of the vagina circumferentially around its wall from 1 o'clock to 11 o'clock, wherein the aspect closest to the urethra is at 12 o'clock" means "";

- "heating the target tissue" means "making the target tissue hotter"; and

- "remodeling the therapeutic zone of target tissue" means "causing a zone of tissue within the target tissue to tighten or contract by heating the zone of tissue to a therapeutic temperature."

SO ORDERED.

/s/ Patti B. Saris
Patti B. Saris
United States District Judge

14